## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 15-62283-CIV-O'SULLIVAN

BEATRIZ ALVARADO,

      **Plaintiff,**

**v.**

CAROLYN W. COLVIN,
**Acting Commissioner of Social Security**
**Administration,**

      **Defendant.**

_____/

### ORDER

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment

with Supporting Memorandum of Law (DE# 20, 04/08/2016), and the Defendant's Motion for

Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion

for Summary Judgment (DE# 21, 05/09/2016). The plaintiff requests the final decision of the

Commissioner of Social Security be reversed and Disability Insurance Benefits ("DIB") be

granted under Title II of the Social Security Act ("SSA"). In the alternative, the plaintiff requests

the final decision of the Commissioner of Social Security be vacated and the case be remanded

for further administrative proceedings. The complaint was filed pursuant to the Social Security

Act ("SSA"), 42 U.S.C. §405(g), and is properly before the Court for judicial review of a final

decision of the Commissioner of the SSA. The parties consented to Magistrate Judge jurisdiction,

(DE# 16, 02/08/2016), and this matter was reassigned to the undersigned pursuant to Judge

Moreno's Order dated February 25, 2016, (DE# 19, 02/25/2016). Having carefully considered the

filings and applicable law, the undersigned enters the following Order.

## PROCEDURAL HISTORY

On March 8, 2012, Beatriz Alvarado ("the plaintiff") filed a DIB application under Title II of the SSA, 42 U.S.C. § 405(g). (Tr. 163). The plaintiff's application was initially denied on April 11, 2012, and was denied again on reconsideration on July 26, 2012. (Tr. 103-108, 114-119). The plaintiff requested a hearing in front of an administrative law judge ("ALJ") on September 19, 2012. (Tr. 120-121). The ALJ held a hearing on December 13, 2013. (Tr. 33-65). On March 17, 2014, the ALJ denied plaintiff's application for disability insurance benefits. (Tr. 17-27). The plaintiff filed an appeal to the Appeals Council requesting review of the ALJ's decision. (Tr. 1). The Appeals Council denied the plaintiff's request for review on September 22, 2015. (Tr. 1-7). The plaintiff filed this claim, pursuant to 42 U.S.C. § 405(g), seeking reversal of the Commissioner's final decision. (Tr. 163). In the alternative, the plaintiff requests remand for further administrative proceedings. (Id.).

## FACTS[1]

The plaintiff was born on January 24, 1956, and was 55 years old at the time of the alleged onset date. (Tr. 66). The plaintiff has a bachelor's degree in business administration with a concentration in accounting, and has relevant work experience as an insurance agent, a sales person, and a customer service representative. (Tr. 37-38, 212). The plaintiff alleges that on August 18, 2011, the date that she was terminated from her most recent position as a customer service representative for reasons unrelated to her health, she became unable to work due to depression and fibromyalgia. (Tr. 41-43, 163). Over the next one and one-half years, the plaintiff

---

[1]All references to "Tr." refer to the transcript of the Social Security Administration record filed on February 8, 2016. See, Social Security Transcripts (DE# 15, 02/08/2016). Moreover, the page numbers refer to those found on the lower right hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page numbers that may appear.

collected unemployment and applied for various jobs. (Tr. 41-43). While collecting unemployment, the plaintiff informed the unemployment office that she was able to work. (Tr. 45). Since July 2010, the plaintiff has been examined by her primary care physician a number of times, and various non-examining medical physicians and experts have also reviewed the plaintiff's medical records. (Tr. 60-61, 94-99, 280-307, 312-315, 319-324, 326-339). The findings of these physicians and experts are further detailed below.

I. Mental and Physical Examinations Conducted by Dr. Cindy Marika

Dr. Cindy Marika has been the plaintiff's primary care physician since at least 2005. (Tr. 327). The plaintiff provided medical records regarding her visits with Dr. Marika from July 2010 through November 2013. (Tr. 280-307, 326-339).

On July 6, 2010, Dr. Marika diagnosed the plaintiff with fibromyalgia. (Tr. 288). Eighteen months later, on January 5, 2012, the plaintiff visited Dr. Marika complaining of troubles and pain related to her fibromyalgia.(Tr. 284). In her examination notes, Dr. Marika described that the severity of the plaintiff's pain has led the plaintiff to tears and has created difficulties for the plaintiff in completing routine activities, such as shopping and housecleaning. (Id.). Dr. Marika noted that the plaintiff suffered from poor memory, tearfulness, depression and back pain. (Id.). A few weeks later, on January 26, 2012, Dr. Marika examined the plaintiff again and noted that the plaintiff suffered from stiffness in the morning. (Tr. 282).

The plaintiff continued to seek treatment from Dr. Marika after filing her DIB application dated March 8, 2012. (Tr. 163). On April 4, 2012, Dr. Marika examined the plaintiff and completed a treating source fibromyalgia questionnaire and a mental status report. (Tr. 295-299). In the treating source fibromyalgia questionnaire, Dr. Marika noted the following: (1) the

3

plaintiff showed positive tender points; (2) the plaintiff had to rest with walking; (3) the plaintiff experienced fatigue, morning pain and much hand, neck, shoulder and muscle pain; (4) the plaintiff had grip and lower extremity strength ratings of 5 out of 5; and (5) the plaintiff required multiple 15-minute rest breaks daily. (Tr. 295-296). In the mental status report, Dr. Marika diagnosed the plaintiff with fibromyalgia and concluded that the plaintiff's chronic pain would make employment difficult. (Tr. 298-299). In her examination notes, Dr. Marika noted that medication does not seem to help the plaintiff and that the plaintiff's pain ranged from 5-10 on a scale of 1-10, where 10 causes crying. (Tr. 306).

On May 22, 2012, Dr. Marika examined the plaintiff again and completed another treating source fibromyalgia questionnaire. (Tr. 304-305). Dr. Marika noted that the plaintiff suffered from malaise[2], required hours of rest per day, and had grip strength and lower extremity strength scores of 5 out of 5. (Id.).

On July 29, 2013, the plaintiff visited Dr. Marika complaining of headaches and paresthesia[3] of her hands and feet. (Tr. 337). The plaintiff also stated that she was suffering the following symptoms: joint and muscle pain, stiffness, muscle weakness, neck and back pain, headaches, migraines, short-term memory loss, and numbness of the hands in the morning. (Tr. 339). Dr. Marika prescribed Elavil for the plaintiff to treat her depression. (Tr. 337).

On August 22, 2013, the plaintiff explained to Dr. Marika that her headaches were improving and her joint pain was 5 out of 10, but that she was experiencing numbness in her extremities for 30 minutes in the mornings, and she was suffering from sciatica, causing lower

---

[2] According to www.nlm.nih.gov, malaise is a general feeling of discomfort, illness, or lack of well-being.

[3] According to www.webmd.com, paresthesia is an abnormal and uncomfortable sensation of tingling, numbness, or burning, typically in the hands, feet, arms, or legs. In other words, paresthesia is the correct medical terminology for the tingling feeling one gets when his or her hand, foot, arm, or leg "falls asleep."

back pain . (Tr. 335). Dr. Marika advised the plaintiff to continue taking her prescribed Elavil to treat her depression. (Tr. 336).

On November 4, 2013, Dr. Marika examined the plaintiff and completed a fibromyalgia syndrome medical assessment form. (Tr. 327-334). Dr. Marika's examination notes reflect that the plaintiff was complaining of headaches, congestion and anxiety. (Tr. 333). Dr. Marika noted that the plaintiff was generally demonstrating normal results, yet still diagnosed her with fibromyalgia, upper respiratory infection/cough, anxiety, and depression. (Tr. 334). Dr. Marika prescribed Elavil for the plaintiff to treat her depression and Hycodan to treat her upper respiratory infection and cough. (Id.).

As to the fibromyalgia syndrome medical assessment form (Tr. 327-331), Dr. Marika diagnosed the plaintiff with fibromyalgia, chronic fatigue syndrome, anxiety and depression, and assessed the plaintiff's prognosis as "fair." (Tr. 327). Dr. Marika then noted the following symptoms: chronic pain, muscle weakness, morning stiffness, subjective swelling, frequent and severe headaches, temporomandibular joint dysfunction[4], paresthesia, chronic fatigue, depression, and panic attacks. (Id.). Although Dr. Marika listed the plaintiff's tenderness as a positive objective sign of the plaintiff's impairment, Dr. Marika failed to identify any specific pain points. (Tr. 328).

In a fibromyalgia syndrome medical assessment form dated November 4, 2013, Dr. Marika opined on the plaintiff's ability to work. (Tr. 327-331). Dr. Marika noted that the

---

[4]According to the National Institute of Dental and Craniofacial Research, temporomandibular joint dysfunction ("TMJ") can be defined as pain in the jaw joint and in the muscles that control jaw movement. According to www.nlm.nih.gov, TMJ may be caused by arthritis, jaw injury, or a combination of other factors. TMJ usually causes the following symptoms: (1) pain that travels through the face, jaw, or neck; (2) stiff jaw muscles; (3) limited movement of locking of the jaw; (4)  painful clicking or popping in the jaw; and/or (5) a change in the way the upper and lower teeth fit together.

plaintiff's symptoms would likely interfere with her attention and concentration "at least frequently." (Tr. 328). Dr. Marika also noted that during a workday, the plaintiff would be able to sit for at least six hours and stand or walk for about two hours at a time, would require more than ten five-minute breaks throughout the workday due to pain and chronic fatigue, and would require elevation of her legs in a recliner chair following any periods of prolonged sitting because of her pain. (Tr. 330). Dr. Marika noted that the plaintiff was unable to stoop or bend at the waist, was rarely able to twist at the waist, and was rarely able to carry items weighing less than ten pounds. (Id.). Dr. Marika also indicated on the form that the plaintiff would never be able to carry items weighing 10, 20, or 50 pounds. (Id.).  Dr. Marika concluded that the plaintiff would likely be absent from work more than four days per month and would be unable to perform or be exposed to the following work activities or environments: (1) routine, repetitive tasks at a consistent pace; (2) detailed or complicated tasks; (3) strict deadlines; (4) close interaction with coworkers or supervisors; (5) fast-paced tasks (e.g., production line); and (6) exposure to work hazards (e.g., heights or moving machinery). (Tr. 329, 331).

II. Psychological Examination by Dr. Michael Simpson

On July 6, 2012, Dr. Michael Simpson performed a consultative psychological examination of the plaintiff. (Tr. 312-315). Dr. Simpson noted that the plaintiff suffered from the following symptoms: pain, depression, stress, coping difficulties, insomnia, mood changes, headaches, and memory and concentration difficulty. (Tr. 312). Dr. Simpson noted that the plaintiff had also been experiencing the following symptoms, which were likely to interfere with her social functioning: anxiety, depression, sadness, tearfulness, fatigue, pain, slow pace and cognitive impairment. (Tr. 314). In his report, Dr. Simpson also noted that the plaintiff is in pain

6

throughout the day, overwhelmed, unable to concentrate on tasks until they are finished, and

cannot understand or remember what she sees on TV or reads. (Id.). Dr. Simpson judged the

plaintiff's short-term memory as marginal and immediate memory as below average. (Id.). The

plaintiff explained to Dr. Simpson that she had become more easily frustrated, was constantly

exhausted, always felt sick with a bad cold or the flu, was sad and having crying spells, and was

experiencing concentration and memory difficulties. (Id.). Dr. Simpson's diagnostic impression

was as follows:

| | | |
|---|---|---|
| | 309.24 | Adjustment Disorder with Anxiety |
| Axis I: | 296.21 | Major Depressive Disorder, Single Episode, Mild |
| | 294.9 | Cognitive Disorder NOS |
| Axis II: | V71.09 | No Diagnosis on Axis II |
| Axis III: | Fibromyalgia | |
| Axis IV: | Occupational problems, problems with access to health care services, other psychosocial and environmental problems | |
| Axis V: | Present GAF[5] = 50 Highest GAF Past Year = 55 | |

(Tr. 315). Dr. Simpson concluded that the plaintiff's prognosis was poor and that the plaintiff has

significant medical problems and limitations. (Id.). Dr. Simpson opined that the plaintiff would

benefit from participating in an outpatient psychotherapy program to address her depression and

---

[5]According to www.disabilitybenefitscenter.org, a global assessment of function ("GAF") is used in SSA to determine mental status. It's mainly used by mental health practitioners to document, diagnose, and offer prognosis regarding mental health. The GAF scoring system is based on severity of symptoms and level of functioning for individuals under mental health care. The scores are divided into numerical categories, ranging from 1 to 100. The lower the score, the greater the severity of the mental health. For example, a score between 91 and 100 designates a person's ability to function in a positive manner in their daily environment with no depression, anxiety, or mood disorders. A person with a score between 51 and 60 may experience moderate symptoms as well as difficulty functioning in social environment and bouts of panic or anxiety attacks. A person with a score between 1 and 10 may be considered suicidal and have a potential of hurting themselves and others.

anxiety. (Id.).

III. Medical Evidence Review by Dr. Linda Caldwell

On June 6, 2012, Dr. Linda Caldwell, a medical consultant with the State Agency, reviewed the plaintiff's medical records and concluded that the plaintiff's fibromyalgia was not established as a medically determined impairment ("MDI"). (Tr. 80-81). Dr. Caldwell gave the following reasons for this aforementioned conclusion: the plaintiff had a grip strength and lower extremity strength score of 5 out of 5, and pain and fatigue are not documented MDIs. (Tr. 80-81, 94). Dr. Caldwell found that the plaintiff had the residual functioning capacity ("RFC") to perform past relevant work as generally performed in the national economy. (Tr. 100). Dr. Caldwell stated that the evidence showed some limitations in the performance of certain work activities, but that these limitations would not prevent the plaintiff from performing past relevant work as a sales person. (Id.). Dr. Caldwell determined that the plaintiff was not disabled. (Id.).

IV. Medical Evidence Review by Dr. Alan Harris

On July 19, 2012, Dr. Alan Harris, a medical consultant with the State Agency, reviewed the plaintiff's medical records and concluded that the plaintiff was mentally capable to work. (Tr. 95-99). Concerning the plaintiff's ability to work, Dr. Harris noted that the medical records indicated moderate limitations as the most significant of the plaintiff's limitations. (Id.). Dr. Harris stated that the plaintiff appeared capable of following routine, simple, and repetitive tasks with certain physical limitation, and was able to perform simple, daily activities. (Tr. 98). Dr. Harris also stated that the plaintiff would be able to concentrate and pay attention for up to two hours at a time and would require reasonable, but not frequent breaks, throughout the day. (Id.). Dr. Harris explained that the plaintiff should have no issues socially within the work

environment and would be able to accept constructive criticism from supervisors. (Tr. 98-99). Dr. Harris further noted that the plaintiff may prefer repetitive tasks not requiring a change in her daily routine because of her difficulty coping with the stresses of rapid changes in the performance environment. (Tr. 99). Dr. Harris concluded that the plaintiff was able to meet the mental demands of daily competitive work on a sustained basis. (Id.).

V. Examination Conducted by Mercie Vielot , ARNP[6]

On May 24, 2013, Mercie Vielot, ARNP, examined the plaintiff at the Broward Community and Family Health Center following the plaintiff's request to establish primary care. (Tr. 319-324). Ms. Vielot stated that the activities of daily living ("ADL") were very difficult for the plaintiff because of her depression. (Tr. 321). The plaintiff complained of feeling tired with little energy, feeling anxious from one to three days per week, moving or speaking slowly four to five days per week, experiencing sleep disturbances, and suffering from a low self-esteem. (Tr. 319-323). Ms. Vielot reported no current physical complaints. (Tr. 319). The plaintiff exhibited a normal musculoskeletal system, including her neck, cervical, and thoracic regions. (Tr. 322). Ms. Vielot diagnosed the plaintiff with fibromyalgia. (Tr. 323).

VI. The Vocational Expert's Testimony

A vocational expert ("VE"), Mr. Gary Fannon, testified at the ALJ hearing. (Tr. 58-64). Mr. Fannon testified that the plaintiff's past relevant work could be classified as follows: insurance agent, light work; salesperson, light work; customer complaint clerk, sedentary work; customer service representative, sedentary work. (Tr. 60-61). The ALJ then asked Mr. Fannon a number of hypothetical questions to determine the plaintiff's ability to work. (Tr. 62-63). The

---

[6]An ARNP is an Advanced Registered Nurse Practitioner.

first hypothetical asked by the ALJ was as follows:

> If I were to find that the claimant was capable of performing work at the light level, would she be able to do all of her past jobs?

(Tr. 62). Mr. Fannon opined that the claimant would be capable of performing all past relevant work if limited to light work. (Id.). The ALJ then asked the following hypothetical:

> And then at the sedentary level, she's limited to the customer service and customer complaint clerk – is that right?

(Id.). Mr. Fannon opined that, at the sedentary level, the claimant would be limited to her past relevant work as a customer service representative and/or a customer complaint clerk. (Id.). The ALJ then asked the following hypothetical:

> So if I gave [the limitation of simple, routine, repetitive tasks with occasional changes in the work setting] and said at the medium level you would tell me she could do medium, unskilled work jobs basically?

(Id.). Mr. Fannon opined that the claimant would be capable of performing all unskilled work at the medium level if limited to simple, routine, repetitive tasks with occasional changes in the work setting. (Id.). The ALJ then asked the following hypothetical:

> And then what about regardless of the exertional limitations or even the mental limitations, assume an individual would require frequent breaks up to 10 times a day for at least five minutes during the workday, how would that affect them?

(Tr. 63). Mr. Fannon opined that the claimant "wouldn't be able to work and the employer would reprimand that individual after that occurred. In a week they would – they would lose their job rather quickly if that – that occurred and was not corrected, so I would say no work." (Id.). The ALJ then completed his questioning by asking the following hypothetical:

> And similarly, if an individual were to be absent from work more than two times in a month, how would that affect them?

(Id.). Mr. Fannon opined that the individual would "again be reprimanded and then if the

10

behavior was not corrected, they would lose their job so I would say no work." (Id.). The

plaintiff's attorney, Mr. Gary Rawlins, then asked Mr. Fannon the following hypothetical:

> If someone were to be – have their concentration, persistence, or pace interfered with
> 34 to 66% of the time in an average workday, that would also eliminate all work as
> them being off task, correct?

(Id.). Mr. Fannon confirmed by saying "that's correct." (Id.). Mr. Rawlins then added to his

initial hypothetical by asking, "at any exertional level whether it be skilled or unskilled?" to

which Mr. Fannon replied, "correct." (Tr. 64). Mr. Rawlins then asked the final following

hypothetical to Mr. Fannon:

> And there are no jobs that exist in the national economy at any exertional level that
> will allow you to lay down as needed on an unscheduled basis, is that correct?

(Id.). Mr. Fannon opined that he was unaware of any of these kinds of jobs. (Id.).

## VII. The Plaintiff's Testimony

The plaintiff testified on December 13, 2013. (Tr. 35-65). The plaintiff testified that she

was laid off from her most recent job in August of 2011 due to a business downturn. (Tr. 41-42).

The plaintiff alleged that she had been having symptoms prior to being laid off in 2011, including

focus and memory problems. (Tr. 43). She stated that she completed a number of online job

applications while unemployed and reported to the unemployment office that she was able to

work. (Tr. 45).

The plaintiff testified that she had been seeing her primary care physician, Dr. Marika, for

almost 20 years. (Tr. 49). The plaintiff also testified that she did not have health insurance while

unemployed and seeking treatment from Dr. Marika. (Tr. 45, 47). The plaintiff stated that she had

difficulty completing routine tasks, such as bathing, grocery shopping, driving, sleeping, and

turning off the coffee maker. (Tr. 47-53). She also stated that she experienced memory problems

11

(e.g., the plaintiff forgot her social security number at the commencement of the ALJ hearing). (Tr. 53). The plaintiff claimed that she now needs to write everything down on paper, or else she will forget. (Id.). As a result of her physical pain, the plaintiff indicated that she is unable to do anything beyond local driving, and that she has to sit in a recliner chair approximately eight times per day, from roughly fifteen minutes, up to an hour. (Tr. 49-50, 52).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . . ." 42 U.S.C. §§ 416(I) (2004) ; 423(d)(1) (2004); 20 C.F.R. § 404.1505 (2012).  The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(1); 20 C.F.R. §§ 404.1505-1511.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. § 416.920.  The ALJ must first determine whether the plaintiff is presently employed or engaging in substantial gainful activity. If so, a finding of non-disability is made and the inquiry ends. 20 C.F.R. § 416.971 *et seq*. Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 416.920(c). If the plaintiff does not, then a finding of non-disability is made and the inquiry ends. Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in 20 C.F.R. pt. 404, subpt P, app 1. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are

12

established, the regulations require a finding of disability without further inquiry into the plaintiff's ability to perform other work. See Gibson v. Heckler, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" to perform his or her past relevant work. 20 C.F.R § 416.945(a). "Residual functional capacity" is defined as "what you can do despite your limitations." (Id.). This determination takes into account "all relevant evidence," including medical evidence, the claimant's own testimony and the observations of others. (Id.). If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at Step five that there is other work available in the national economy that the plaintiff can perform. 20 C.F.R. § 416.969, 416.969(a); see Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991) (holding the claimant bears the initial burden of proving that he is unable to perform previous work.). Fifth, if the plaintiff cannot perform his or her past relevant work, the ALJ must decide if he or she is capable of performing any other work in the national economy.

## THE ALJ'S FINDINGS

At step one, the ALJ determined the plaintiff had not engaged in substantial gainful activity since August 18, 2011, the alleged onset date. (Tr. 22). This allowed the ALJ to move on to step two to determine whether the plaintiff has a severe impairment or combination of impairments. At step two, the ALJ found that the plaintiff has the severe impairment of depression. 20 C.F.R. § 404.1520(c); (2016) 20 C.F.R. § 416.920(c) (2016); (Tr. 22). However, the ALJ found that the plaintiff's fibromyalgia is not a severe impairment because the fibromyalgia fails to meet the criteria of SSR 12-2p. (Tr. 22). More specifically, SSR 12-2p

13

"requires the following for the diagnosis of fibromyalgia: evidence of widespread chronic pain, including pain in the neck, back or chest, evidence that a physician ruled out other diseases that could result in the same symptoms by testing and examination, and either 11 of 18 tender points occurring on both sides of the body, or repeated manifestations of six or more fibromyalgia symptoms." The ALJ concluded that "Dr. Marika's records do not meet the criteria or the longitudinal requirements of the ruling. Records in May 2012 noted 5/5 grip strength and lower extremity strength." (Id.).

At step three, the ALJ found that the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1" (20 C.F.R. § 416.920(d), 416.925 and 416.926.) (Id.). In the decision, the ALJ assessed whether the "paragraph B" criteria were satisfied by the severity of the plaintiff's mental impairment of depression. (Tr. 23). In order to satisfy the "paragraph B" criteria, "mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Id.). The ALJ then noted the following with respect to the activities of daily living:

> [T]he [plaintiff] has mild restriction. The [plaintiff] prepares simple meals, takes a walk, stretches, watches television, and rests during the day. She is able to care for her personal needs. The [plaintiff] drives short distances. She shops for groceries and washes the dishes with assistance. She does laundry three times per week. In social functioning, the [plaintiff] has mild difficulties. The [plaintiff] lives with her husband, and talks with her children regularly. She is able to shop without assistance, and attends Mass. With regard to concentration, persistence or pace, the [plaintiff] has moderate difficulties. The [plaintiff] reported difficulty with pace, primarily due to pain. She can make a shopping list, and manage a checking account. The [plaintiff] can maintain concentration to watch television shows and read. She reported

14

> difficulty following written and spoken instructions. As for episodes of
> decompensation, the [plaintiff] has experienced no episodes of decompensation,
> which have been of extended duration. (Exhibits 2E, 8F).

(Id.). The ALJ noted that "[b]ecause the claimant's mental impairments do not cause at least two

'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each

of extended duration, the 'paragraph B' criteria are not satisfied." (Id.). The ALJ assessed

whether the "paragraph C" criteria were satisfied, and noted that the evidence failed to establish

the presence of "paragraph C" criteria. (Id.). The ALJ determined that based on the entire record,

the plaintiff's RFC was as follows:

> [T]he plaintiff ha[d] the residual functional capacity to perform a full range of work
> at all exertional levels with the following nonexertional limitations: she can perform
> simple, routine, repetitive tasks on a sustained basis over a normal eight-hour
> workday, with occasional changes in routine work setting.

(Id.).

At step four, the ALJ found that "the claimant's medically determinable impairment

could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

credible . . .". (Tr. 25). The ALJ considered all of the medical records, medical expert opinion

and analysis, and statements and findings made by doctors. (Tr. 25-26). More specifically, the

ALJ gave great weight to the opinion and analysis set forth by Dr. Linda Caldwell because her

"analysis addresse[d] the evidence in the context of the relevant Social Security Rulings and

policy statements" and because her "conclusion [was] consistent with both the evidence and

applicable rulings." (Tr. 25). The ALJ also gave great weight to the opinion of Dr. Alan Harris

because his conclusions were consistent with the medical evidence and consultative exam

conducted by Dr. Simpson. (Id.).

The ALJ gave little weight to the multiple medical source statements of Dr. Marika. (Id.).

The ALJ gave the following reasons for assigning little weight to Dr. Marika:

> [Dr. Marika's findings] are unsupported by the treatment records and objective findings. Dr. Marika's records are limited, and insufficient to support her opinion or establish a diagnosis. While Dr. Marika has seen [the plaintiff] over several years, the visits are sparse and sporadic. Based on her records, [the plaintiff] was seen only one occasion in 2011 and only twice in 2012[7], and there is a gap in treatment from April 4, 2012 until July 2[9], 2013 (sic) (Exhibits 2F, 3F, 5F, 9F, 11F). Of even more significance is the lack of medical findings supported her diagnosis of fibromyalgia . . . Dr. Marika never records trigger points at specific sites at any visits and her examinations generally reflect that [the plaintiff's] musculoskeletal and neurological findings were within normal limits. Furthermore, Dr. Marika's opinion is not supported by other medical records. In fact, when [the plaintiff] sought treatment at the Broward Community and Family Health Center on May 24, 2013, she reported no current physical complaints (Exhibit 10F). She denied musculoskeletal symptoms but reported complaints of fatigue, related to depression. Physical examination of her musculoskeletal and neurological systems were reported as normal. Although she was assessed with fibromyalgia, this was apparently based on her history.

(Tr. 25-26). The ALJ concluded that the "residual functioning capacity was supported by evidence which consistently reflects intact musculoskeletal and neurological systems" and that the "mental limitations are based on the claimant's diagnosis of depression, and her generally credible testimony regarding the effects of depression on her ability to function and activities of daily living." (Tr. 26).

At step five, the ALJ determined the plaintiff was not disabled because there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. (Id.). In making that determination, the ALJ relied on the testimony of the VE, which the ALJ found was consistent with the information contained in the Dictionary of Occupational Titles. (Tr. 27).

---

[7] The record establishes that the plaintiff visited Dr. Marika four times in 2012. Nevertheless, this distinction does not affect the analysis as to whether substantial evidence supports the ALJ's conclusion.

## STANDARD OF REVIEW

The Court must determine if it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C § 405 (g); see Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding that the reviewing court must not re-weigh evidence or substitute their discretion). On judicial review, decisions made by the defendant, the Commissioner of Social Security, are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C § 405(g) (2006); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999). Substantial evidence is more than a scintilla, but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997). Substantial evidence is relevant evidence a reasonable person would accept as adequate to support the ALJ's conclusion. Richardson, 402 U.S. at 401. "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. See Miles v. Charter, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. See Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("Commissioner's failure to apply the correct

17

law or to provide the reviewing court with sufficient reasoning for determining that the proper

legal analysis has been conducted mandates reversal."); accord Martin v. Sullivan, 894 F.2d

1520, 1529 (11th Cir. 1990). The reviewing court must be satisfied that the decision of the

Commissioner is grounded in the proper application of the appropriate legal standards. See Davis

v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide facts anew,

re-weigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs

against the Commissioner's decision, the reviewing court must affirm if the decision is supported

by substantial evidence. See Miles v Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); see also Baker

v. Sullivan, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal

standard applied is not. See Martin, 894 F.2d at 1529. The Commissioner must apply the correct

legal standard with sufficient reasoning to avoid reversal. Id.

## LEGAL ANALYSIS

The plaintiff challenges the ALJ's decision of March 17, 2014. The plaintiff requests that

the ALJ's final decision be reversed and benefits granted "because [the final decision] is not

supported by substantial evidence of record and because the Commissioner committed errors of

law and fact." See Plaintiff's Motion for Summary Judgment with Supporting Memorandum of

Law (DE# 20 at 1, 04/08/2016). In the alternative, the plaintiff requests that "the final decision be

vacated, and the case remanded for further proceedings correctly applying the [SSA] and

regulations in accordance with Eleventh Circuit case law." Id.

The plaintiff has alleged seven issues: (1) the ALJ erred in failing to find that plaintiff's

fibromyalgia is a severe impairment at step 2; (2) the ALJ failed to accord appropriate weight to

the opinions of plaintiff's treating physician, Dr. Marika; (3) the ALJ erred in failing to recontact

18

Dr. Marika for any clarification needed regarding plaintiff's fibromyalgia diagnosis; (4) the ALJ erred in relying on a RFC performed by a non-examining physician in denying plaintiff at step 5; (5) the ALJ erred in failing to find sample jobs and their availability in denying plaintiff at step 5; (6) the ALJ erred in finding plaintiff is capable of performing the mental demands of work at any exertional level on a sustained basis; and (7) the ALJ erred in failing to apply the medical-vocational guidelines. See Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law, at 1-2. As explained below, the undersigned affirms the decision of the Commissioner.

I. Substantial Evidence Supports the ALJ's Determination that the Plaintiff's Fibromyalgia is not a Severe Impairment Under Step 2

An impairment or combination of impairments is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. § 416.921(a). An impairment or combination of impairments is not severe when medical or other evidence establish only a slight abnormality or a combination of light abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 404.1521. A severe impairment also must be severe for at least twelve consecutive months. 20 C.F.R. § 404.1509.

In this matter, the ALJ found that the plaintiff's depression "limits her ability to do basic work activities, and therefore meet the criteria for severity under 20 C.F.R. § 416.920(c)." (Tr. 22). However, the ALJ concluded that the plaintiff's fibromyalgia "does not meet the criteria of SSR 12-2p, and is not considered a medically determinable impairment." (Id.). The ALJ offered the following explanation for this conclusion:

> SSR 12-2p requires the following for the diagnosis of fibromyalgia: evidence of widespread chronic pain, including pain in the neck, back or chest, evidence that a

19

physician ruled out other diseases that could result in the same symptoms by testing and examination, and either 11 of 18 tender points occurring on both sides of the body, or repeated manifestations of six or more fibromyalgia symptoms. Dr. Marika's records do not meet the criteria or the longitudinal requirements of the ruling. Records in May 2012 noted 5/5 grip strength and lower extremity strength (Exhibit 5F).

(Id.). The ALJ explained that Dr. Marika's multiple medical source statements are "unsupported by the treatment records and objective findings." (Tr. 25). Furthermore, the ALJ explained that "of even more significance is the lack of medical findings supporting her diagnosis of fibromyalgia." (Id.). The ALJ noted that "Dr. Marika never records trigger points at specific sites at any visit and her examinations generally reflect that [the plaintiff's] musculoskeletal and neurological findings were within normal limits." (Id.).

The ALJ also considered other evidence when determining whether the plaintiff's fibromyalgia diagnosis was a severe impairment. (Tr. 26). The plaintiff visited Broward Community and Family Health Center on May 24, 2013, where she reported no current physical complaints and denied musculoskeletal symptoms to Vielot Mercie, ARNP. (Id.). Physical examinations of the plaintiff's musculoskeletal and neurological symptoms came back as normal. (Id.). While Ms. Mercie diagnosed the plaintiff with fibromyalgia, the ALJ concluded that this diagnosis "was apparently based on [the plaintiff's] history." (Id.).

The ALJ also considered the plaintiff's hearing testimony and found such testimony as "generally credible," yet insufficient to establish fibromyalgia as a medically determinable impairment under SSR 12-2p. (Tr. 25). The ALJ specifically noted that the plaintiff "did not stop working due to her impairments," collected unemployment while "attesting that she could work during this time," and "despite her impairments, the [plaintiff] is able to prepare simple meals,

20

shop for groceries, do laundry, and wash dishes." (Id.). Furthermore, the ALJ considered the opinion of Dr. Linda Caldwell, who opined that the plaintiff's fibromyalgia diagnosis was insufficient to be considered a medically determinable impairment. (Tr. 94).

As mentioned previously, this Court's duty is to determine whether the record contains substantial evidence to support the ALJ's findings. 42 U.S.C § 405 (g); see Wolfe v. Chater, at 1076. The plaintiff cites the Deputy Commissioner of Social Security's policy regarding fibromyalgia in support of her argument, which is as follows:

> Fibromyalgia is a disorder defined by the American College of Rheumatology (ACR) and we recognize it as medically determinable if there are signs that are clinically established by the medical record. The signs are primarily tender points. The ACR defines the disorder in patients as . . . 'at least 11 of the 18 specified tender points which cluster around the neck and the shoulder, chest, hip, knee, and elbow regions.' Other typical symptoms are irritable bowel syndrome, chronic headaches, temporomandibular dysfunction, sleep disorder, severe fatigue, and cognitive dysfunction.

See Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law at 13. The plaintiff argues that the ALJ "fail[ed] to take into account numbness in the upper and lower extremities, headaches, fatigue, sleep disorder and cognitive dysfunction all noted on the record and expressly outlined by the Commissioner as symptoms of fibromyalgia material in making a determination regarding severity." Id. at 14. The plaintiff also argues that the ALJ's analysis "at step 2 is incredibly insufficient because [the plaintiff's] treating physician, Dr. Cindy Marika, diagnosed [the plaintiff] with fibromyalgia and noted she had a history of chronic pain, chronic fatigue, and positive tender points." See Plaintiff's Reply to Defendant's Motion for Summary Judgment (DE# 23 at 6, 05/25/2016).

As stated above, SSR 12-2p requires evidence of widespread chronic pain, in addition to

either 11 of 18 tender points occurring on both sides of the body, or repeated manifestations of six or more fibromyalgia symptoms. The plaintiff fails to establish that she repeatedly manifested six or more fibromyalgia symptoms, or that at least 11 out of 18 trigger points were recorded. The plaintiff relied on Dr. Marika's findings and opinion in support of her argument. However, the ALJ found that Dr. Marika's "[r]ecords in May 2012 noted 5/5 grip strength and lower extremity strength" and that "Dr. Marika never records trigger points at specific sites at any visit and her examinations generally reflect that claimant's musculoskeletal and neurological findings were within normal limits." (Tr. 22, 25). Furthermore, the plaintiff cites a number of symptoms recorded by Dr. Marika. See Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law at 14. However, it is unclear whether these cited symptoms, which range from headaches to TMJ, constitute fibromyalgia symptoms.

The court in Crawford v. Commissioner of Social Security, 363 F.3d 1155 (11th Cir. 2004) held that even if the court finds the evidence preponderates against the Commissioner's decision, the court must affirm the Commissioner's decision if substantial evidence supports the Commissioner's decision. Crawford, 363 F.3d at 1158. The ALJ's decision is still supported by substantial evidence. The ALJ considered a number of medical opinions and findings when determining whether the plaintiff's fibromyalgia satisfied the requirements of SSR 12-2p. (Tr. 25). Therefore, the undersigned must affirm the ALJ's decision because it is supported by substantial evidence.

The plaintiff also cites to SSR 99-2p to present the "considerable overlap" between fibromyalgia and chronic fatigue syndrome ("CFS") in support of her argument that her fibromyalgia is a severe impairment. The plaintiff argues that "individuals with CFS who have

tender points have a medically determinable impairment, and that claimants with impairments that fulfill the ACR criteria for [fibromyalgia syndrome] (which includes a minimum number of tender points) may also fulfill the criteria for CFS." See Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law, at 13. The plaintiff also argues that "even in cases where the claimant does not have the tender points to establish fibromyalgia syndrome, they 'will still be found to have a medically determinable impairment." Id. However, the medical evidence does not specify the minimum number of required tender points, and thus doesn't fulfill the ACR criteria for fibromyalgia syndrome. Furthermore, the plaintiff doesn't provide the entirety of the "considerable overlap" explained in SSR 99-2p, which states that "individuals **with CFS** who do not have the specified number of tender points to establish fibromyalgia syndrome, will still be found to have a medically determinable impairment." (emphasis added). While the plaintiff may have symptoms similar to those common in CFS, the plaintiff has not been diagnosed with CFS, and thus, SSR 99-2p does not apply.

The ALJ considered the entirety of the medical evidence in the context of the requirements under SSR 12-2p and found that the plaintiff's fibromyalgia is not a severe impairment at step 2. The plaintiff's argument alluding to a considerable overlap between CFS and fibromyalgia failed to take into account that the ACR requirements were not met, and that the plaintiff was never diagnosed with CFS. For these reasons, the ALJ's conclusion at step 2 that the plaintiff's fibromyalgia was not a severe impairment was supported by substantial evidence.

II. The ALJ was Correct in Assigning Little Weight to the Medical Opinion of Dr. Marika

The ALJ considered and accorded less than controlling weight to the opinion of the

23

plaintiff's treating physician, Dr. Marika, when determining the plaintiff's RFC. (Tr. 25). In most circumstances, the regulations require that an ALJ give more weight to the opinion of a treating source. See 20 C.F.R. § 404.1527(d)(2); see also MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986), Broughton v. Heckler, 776 F.2d 961-62 (11th Cir. 1985); Hunter v. Comm'r of Soc. Sec., 808 F.3d 818, 823 (11th Cir. 2015). The ALJ must accord a treating source opinion controlling weight where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Roth v. Astrue, 249 F. App'x. 167, 168 (11th Cir. 2007). However, the opinion of a treating source may be given less weight in circumstances when the evidence supports a contrary finding or does not support the opinion given by the source. 20 C.F.R. § 416.927; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991). The ALJ may discount a treating source's opinion when "good cause exists for not heeding the treating physician's diagnosis."[8] Edwards, 937 F.2d at 583. When controlling weight is not accorded to the treating source opinion, the ALJ must consider the physician's specialization, the length of the treatment relationship, the nature and frequency of examinations, the evidence offered in support of the opinion, and the consistency of that opinion with the record as a whole. 20 C.F.R. § 404.1527(d); Schuhardt v. Astrue, 303 F. App'x. 757, 759 (11th Cir. 2008). Additionally, the ALJ is required to "state with particularity the weight given to different medical opinions and the reasons therefor." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2006) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987)).

---

[8] "Good cause" exists when the "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citations omitted).

Here, the ALJ accorded "little weight to the multiple medical source statements of Dr. Marika." (Tr. 25). The ALJ determined that the medical source statements are "unsupported by the treatment records and objective findings" and that Dr. Marika's records are "limited, and insufficient to support her opinion or establish a diagnosis." (Id.). The plaintiff argues that "the ALJ still erred by failing to sufficiently explain how the [p]laintiff's treating physician's conclusions were not supported by the treatment records or Dr. Marika's own records." See Plaintiff's Reply to Defendant's Motion for Summary Judgment, at 2. The plaintiff quotes the following from Morrison v. Barnhart, 278 F. Supp. 2d 1331 (M.D. Fla. 2003),  in support of her argument: "the ALJ was to . . . identify specifically what evidence of record 'as a whole' was inconsistent and which of the physician's 'own examination findings were inconsistent with [the ALJ's] opinion.'" Id., see Morrison v. Barnhart, 278 F. Supp. 2d 1331, 1336 (M.D. Fla. 2003). However, the ALJ explained the following detailed reasons for assigning Dr. Marika's statements little weight:

> While Dr. Marika has seen [the plaintiff] over several years, the visits are sparse and sporadic. Based on her records, [the plaintiff] was seen on only one occasion in 2011 and only twice in 2012, and there is a gap in treatment from April 4, 2012, until July 24, 2013. Of even more significance is the lack of medical findings supporting her diagnosis of fibromyalgia. As stated above, Dr. Marika never records trigger points at specific sites at any visit and her examinations generally reflect that [the plaintiff's] musculoskeletal and neurological findings were within normal limits.

> Furthermore, Dr. Marika's opinion is not supported by other medical records. In fact, when [the plaintiff] sought treatment at the Broward Community and Family Health Center on May 24, 2013, she reported no current physical complaints. She denied musculoskeletal symptoms but reported complaints of fatigue, related to depression. Physical examination of her musculoskeletal and neurological systems were reported as normal. Although she was assessed with fibromyalgia, this was apparently based on her history.

25

(Tr. 25-26). The ALJ further explained that Dr. Marika's "[r]ecords in May 2012 noted 5/5 grip strength and lower extremity strength." (Tr. 22). Thus, the record is contrary to the plaintiff's argument that the ALJ failed to base her decision on the evidence of record "as a whole" and that the ALJ failed to sufficiently explain the reasons why Dr. Marika's opinion is not supported by her treatment records.

In response to the ALJ's indication that there were gaps in the plaintiff's visits to Dr. Marika, the plaintiff notes that the gaps in her treatment were due to the fact that she did not have insurance. See Plaintiff's Motion for Summary Judgment, at 11. In support of this notion, the plaintiff cites to the hearing held before the ALJ on December 13, 2013, where the plaintiff tried to explain the reasons for the gap in visits to Dr. Marika was due to the lack of insurance. (Id.) (quoting Tr. 45). The plaintiff cites to SSR 96-7p, which states that the "adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." See SSR 96-7p. Citing again to SSR 96-7p, the plaintiff notes that included in the aforementioned good reasons are the inability to afford treatment or access low or no cost medical treatment. Id. While the undersigned notes that a lack of insurance may constitute a good reason for gaps in treatment, the undersigned finds that the gaps in treatment were plentiful, and despite a lack of insurance, the plaintiff could have sought medical treatment from low or no cost sources if her lack of insurance prevented her from seeking treatment from Dr. Marika.

The plaintiff also argues that the ALJ erred in assigning little weight to Dr. Marika's opinion because there was no good cause to do so. As explained in footnote 7 above, "good cause

26

exists when the . . . (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips, 357 F.3d at 1240-41. Substantial evidence supports the ALJ's conclusion that Dr. Marika's opinion was inconsistent with her own medical records, and also inconsistent with a number of other medical opinions and treatment records. Thus, the ALJ was correct in assigning little weight to Dr. Marika's medical opinion because the inconsistency in Dr. Marika's opinion with her own records and with the records of other medical providers provided the ALJ with good cause to do so.

III. The ALJ Was Not Required to Recontact Dr. Marika

The plaintiff argues that because the Quality Assurance Review ("QAR") managers, Mr. and Ms. Basset, "contend that additional development is indeed warranted to support the diagnosis of fibromyalgia as [a medically determinable impairment]," the ALJ should have recontacted Dr. Marika under 20 C.F.R. § 404.1520b(c)(3). See Plaintiff's Reply to Defendant's Motion for Summary Judgment, at 9-10. The defendant cites to 20 C.F.R. § 404.1520b(c) in support of its argument that "[t]he current regulations regarding recontacting merely provide that if the evidence is insufficient to determine whether the claimant was disabled or not disabled, an [ALJ] 'may' recontact a claimant's treating physician." In addition, 20 C.F.R. § 404.1520b(b) states that "if any of the evidence in [the plaintiff's] case records, including any medical opinion(s), is inconsistent, [the ALJ] will weigh the relevant evidence and see whether [he or she] can determine whether [the plaintiff is] disabled based on the evidence." Here, the ALJ had the following medical evidence related to the plaintiff's claim of fibromyalgia: Dr. Marika's medical treatment records and RFC opinion, Dr. Caldwell's medical records, Dr. Harris' medical records, and the medical records from Broward County and Family Health Center dated May 24,

2013. The ALJ found this medical evidence was sufficient to conclude that the plaintiff's fibromyalgia was not a severe impairment under SSR 12-2p. Because the totality of the medical evidence was sufficient for the ALJ to make her conclusion, the ALJ was not required to recontact Dr. Marika under 20 C.F.R. § 404.1520b(c).

IV. The ALJ Did Not Err in Relying on Dr. Caldwell's and Dr. Harris' RFCs

The plaintiff argues that the ALJ erred in assigning great weight to the medical opinions and RFCs of the non-examining physicians, namely Dr. Caldwell and Dr. Harris. According to 20 C.F.R. § 404.1527(b), the ALJ "will always consider the medical opinions in [the plaintiff's] case record together with the rest of the relevant evidence." Generally the ALJ is to give more weight to the opinion of a source who has examined the plaintiff than the opinion of a source who has not examined the plaintiff because the examining source is likely the medical professional most able to provide a detailed, longitudinal picture of the plaintiff's medical impairment(s). See 20 C.F.R. §§ 404.1527(c)(1), (c)(2). However, as explained above, the ALJ had good cause for assigning little weight to Dr. Marika's opinion because her medical source statements were inconsistent with her own treatment records and objective findings.

The defendant argues that under 20 C.F.R. §§ 404.1527(c)(3), (c)(4), "Dr. Caldwell and Dr. Harris' opinions were consistent with the evidence of record, and, therefore, the ALJ properly gave these opinions great weight." See Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, at 10. The defendant cites two Eleventh Circuit cases in support of its argument. The court in Forsyth v. Commissioner of Social Security, 503 F. App'x 892 (11th Cir. 2013), found that "the ALJ did not err by giving more credence to [the non-examining doctor's] conclusions than to

28

those of [treating physicians]" because the treating physicians conducted improper exams and provided materially inconsistent observations. <u>Forsyth</u>, 503 F. App'x at 893.  Furthermore, the court in <u>Cooper v. Commissioner of Social Security</u>, 51 F. App'x 803 (11th Cir. 2013),  stated that "even if the non-examining doctor was unable to review all of [the plaintiff's] medical records before making [his or her] RFC determination, [the non-examining doctor] cited several portions of the record in support of [his or her] conclusions, and the ALJ, who made the ultimate determination, has access to the entire record." <u>Cooper</u>, 521 F. App'x at 807. It is unclear whether Dr. Caldwell and Dr. Harris reviewed all of the plaintiff's medical records when making their RFC determinations; however, they did cite several portions of the record and the ALJ had access to the entire record when making her RFC determination. For these reasons, Dr. Caldwell's and Dr. Harris' opinions and findings provide substantial evidence for the ALJ's RFC determination, and the ALJ properly relied on the opinions and findings of those doctors.

V. Citation to Sample Jobs and Their Availability in Step 5

After determining the plaintiff's RFC, the ALJ concluded that the plaintiff was incapable of performing her past relevant work because she is limited to unskilled work. (Tr. 26). Because the plaintiff was deemed unable to perform any past relevant work, the ALJ had to determine whether other work existed that the plaintiff could perform.  According to the VE, Mr. Fannon, unskilled work can otherwise be described as "simple, routine, repetitive tasks on a sustained basis over a normal eight-hour workday with occasional changes in a routine work setting." (Tr. 23). The plaintiff argues that the ALJ erred by failing to cite specific jobs that the plaintiff is capable of performing in violation of SSR 83-14. In response, the defendant argues that under 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(b), "the 'grids' take administrative notice of the

29

numbers of unskilled jobs at the various exertional levels that exist throughout the national economy." <u>See Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment</u>, at 13. According to 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(b), when all of the vocational factors and plaintiff's RFC coincide with the criteria of a rule in the Grids, the existence of unskilled jobs that exist throughout the national economy at the various functional levels (sedentary, light, medium, heavy, and very heavy) is established.

The ALJ found the plaintiff is capable of performing a full range of work at all exertional levels, with only non-exertional limitations of "simple, routine, repetitive tasks on a sustained basis over a normal eight-hour workday, with occasional changes in a routine work setting." (Tr. 23). The ALJ concluded that based on the VE's testimony, and considering the plaintiff's age, education, work experience, and RFC, the plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and that a "finding of 'not disabled' is therefore appropriate under the framework section of 204.00 in the [Grids]." (Tr. 27). In other words, the ALJ found that the plaintiff had no exertional limitations, and was capable of performing the work in rule 204.00. Because under 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(b), the Grids take administrative notice of the numbers of unskilled jobs at the various exertional levels that exist in the national economy, and because unskilled work requires only little or no judgment to perform duties. The ALJ need not cite specific examples of jobs that exist within the national economy. Accordingly, the ALJ's analysis was proper.

VI. The ALJ Correctly Found that the Plaintiff is Capable of Performing the Mental Demands of
Work at Any Exertional Level on a Sustained Basis

As set forth in SSR 85-15:

The basic mental demands of competitive, remunerative, unskilled work include the
abilities (on a sustained basis) to understand, carry out, and remember simple
instructions; to respond appropriately to supervision, coworkers, and usual work
situations; and to deal with changes in a routine work setting. A substantial loss of
ability to meet any of these basic work-related activities would severely limit the
potential occupational base. This, in turn, would justify a finding of disability
because even favorable age, education, or work experience will not offset such a
severely limited occupational base.

*Example 1*: A person whose vocational factors of age, education, and work
experience would ordinarily be considered favorable (i.e., very young age, university
education, and highly skilled work experience) would have a severely limited
occupational base if he or she has mental impairment which causes a substantial loss
of ability to respond appropriately to supervision, coworkers, and usual work
situation. A finding of disability would be appropriate.

According to the plaintiff, Dr. Simpson's consultative psychological exam noted that the plaintiff

has pain throughout the day, is overwhelmed, is unable to concentrate on tasks until they are

finished, and cannot understand or remember what she sees on TV or reads. Accordingly, the

plaintiff argues that the ALJ incorrectly found that the plaintiff is capable of meeting the mental

demands of work on a sustained basis. However, the ALJ based the RFC determination on the

complete record, including the opinions and findings from Dr. Marika and the opinions and findings

from a number of other doctors. The undersigned finds that the record provides evidence to support

the ALJ's finding that the plaintiff is capable of performing the mental demands of work at any

exertional level on a sustained basis. In other words, the ALJ's conclusion that the plaintiff was

capable of performing a full range of work at all exertional levels but with certain non-exertional

limitations was based on substantial evidence.

The plaintiff also contends that the ALJ failed to properly present hypotheticals to the VE in determining the plaintiff's RFC. The plaintiff argues that the ALJ said nothing on the plaintiff's moderate mental limitations, which were noted in Dr. Harris' medical records. The plaintiff cited Winschel v. Commissioner of Social Security, 631 F.3d 1176 (11th Cir. 2011), which states that "a claimant's moderate limitation as to concentration, persistence, or pace must be explicitly included in the hypothetical question posed to a VE." Winschel, 631 F.3d at 1180. However, the Winschel case is distinguishable from this matter. The court in Winschel looked to other circuits to determine whether the questions to the VE were sufficient to account for a plaintiff's moderate limitations and their effect on performing work. Id. The court stated that "[b]ecause the ALJ asked the [VE] a hypothetical question that failed to include or otherwise implicitly account for all of [the plaintiff's] impairments, the VE's testimony is not 'substantial evidence' and cannot support the ALJ's conclusion." Here, the ALJ asked the VE the following hypothetical:

> So if I gave [the limitation of simple, routine, repetitive tasks with occasional changes in the work setting] and said at the medium level you would tell me she could do medium, unskilled work jobs basically?

(Tr. 62). The VE opined that the plaintiff would be capable of performing all unskilled work at the medium level if limited to simple, routine, repetitive tasks with occasional changes in the work setting. (Id.). Therefore, the plaintiff's impairments cause only non-exertional limitations (i.e., the plaintiff can perform simple, routine, repetitive tasks on a sustained basis over a normal eight-hour workday, with occasional changes in a routine work setting). The limitation that the plaintiff can only perform simple, routine, repetitive tasks on a sustained basis over a normal eight-hour workday, with occasional changes in a routine work setting was noted by Dr. Harris in his medical records, (Tr. 98), and presented by the ALJ to the VE in the above hypothetical. (Tr.

62). The hypothetical posed to the VE by the ALJ in this matter implicitly accounts for the plaintiff's impairment by stating the limitations the impairments create. Accordingly, the VE's testimony is substantial evidence that the ALJ relied on when determining the plaintiff's RFC, and the ALJ properly found that the plaintiff is capable of performing the mental demands of work at any exertional level.

VII. The ALJ Acted Properly in the Way Medical-Vocational Guidelines Were Applied in this Case

The plaintiff argues that the ALJ improperly applied the Grids, which caused the ALJ to find that the plaintiff is capable of performing the exertional demands of light work. See Plaintiff's Reply to Defendant's Motion for Summary Judgment, at 18. In accordance with the analysis made by the undersigned earlier, the ALJ correctly applied rule 204.00 in assessing the plaintiff's RFC and her ability to perform unskilled work. Because the ALJ's RFC determination was properly made, and because the ALJ properly applied rule 204.00, substantial evidence existed for the ALJ to support the conclusion that the plaintiff is capable of performing a full range of work at all exertional levels. Accordingly, the ALJ acted properly in the way the medical-vocational guidelines were applied in this matter.

**RULING**

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**,

the Plaintiff's Motion for Summary Judgment (DE#20, 04/08/2016) is **DENIED**, and the

Defendant's Motion for Summary Judgment (DE#21, 05/09/2016) is **GRANTED** in accordance

with this Order.

DONE AND ORDERED at the United States Courthouse, Miami, Florida this

**30th** day of June, 2016.

_____

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All counsel of Record

34